**In re RICHARD P.**

**In re FRANCES J.**

**Nos. 82–27–M.P., 82–48–M.P.**

Supreme Court of Rhode Island.

Sept. 30, 1982.

Mary E. Levesque, Paula Rosin, Steven M. Placella, Asst. Public Defender, for petitioners.

Joseph M. Arthurs, Sp. Asst. City Sol., Providence, for respondent.

## OPINION

KELLEHER, Justice.

We have consolidated these two petitions, each of which seeks a writ of habeas corpus and the petitioner's release from the Rhode Island Training School for Youth. Each petitioner has been adjudged by the Family Court to be delinquent. Richard's commitment to the training school is the result of his involvement during late October 1980 with the burning of a bulldozer. Frances's adjudication followed a hearing and a finding that she had committed murder. Both adjudications and commitments resulted from acts committed when the petitioners were under eighteen. Their claim of an illegal confinement is based upon their contention that the Family Court jurisdiction over eighteen-year-olds terminated once the last day of 1981 began. To understand the petitioners' claim better, we must refer briefly to the pertinent statutes and legislative action that gave rise to this controversy.

The Family Court came into existence with the passage by the General Assembly at its January 1961 session of the Family Court Act, known then as P.L. 1961, ch. 73, but whose provisions during the course of time have been dispersed among various portions of our General Laws, specifically in such places as titles 8, 11, 14, 15, 36, and 42 of our General Laws. The Family Court was initially established for the purpose of dealing exclusively with matters affecting the integrity of the family unit; and to accomplish this goal, the General Assembly transferred the Superior Court's domestic-relations jurisdiction and the original jurisdiction of the Juvenile Court over certain matters to the newly created tribunal. *State v. Zittel*, 94 R.I. 325, 328–29, 180 A.2d 455, 457 (1962).

The statutory framework to which we have referred was for many years found in G.L. 1956 (1969 Reenactment) chapter 1 of title 14. Section 14–1–3(C) defined and still defines a "child" as "a person under eighteen (18) years of age." Section 14–1–5(A) conferred and still confers upon the Family Court "exclusive original jurisdiction over any child residing or being within the state" who is adjudicated to be delinquent, wayward, dependent, neglected, mentally defective, or mentally disordered. In a section entitled "Retention of Jurisdiction," § 14–1–6 for many years stipulated that once the Family Court had obtained jurisdiction over the case of any child, such child would, with the exception of certain specific circumstances, continue to be subject to the court's jurisdiction until the child had attained the age of twenty-one.

When the 1956 General Laws of Rhode Island were originally printed, published, and distributed in 1957, volume 3 contained titles 11 through 18. Subsequently, in 1969, the publishers of the General Laws acknowledged the difficulty of effectively using the pocket supplement whose girth had expanded to unwieldy proportions as one annual supplement was replaced by another. Thus, the publishers, with the cooperation of the Secretary of State's law-revision assistant, revised and republished the titles to which we have just alluded. Titles 11 on through 14 were published in volume 3: 1969 Reenactment, and volume 3A: 1969 Reenactment contained titles 15 through 18.

Twelve years later, in 1981, with the help of its editorial staff and the cooperation of the assistant secretary of state in charge of law revision, the publisher replaced 1969's volumes 3 and 3A. As part of the 1981 replacement process, a bill was introduced in the House of Representatives on March 3, 1981.[1] It was entitled "An Act Reenacting Titles 11 through 18, Both Inclusive, of the General Laws of 1956, as Amended." The bill was numbered by the clerk of the

House as No. 81–H–5692 and was referred to the House Committee on Judiciary. It was reported out of committee on March 25 and approved by the House on March 31.[2] The bill subsequently received Senate approval and was signed by the Governor on May 20.[3] Attached to the bill was an explanation of its contents prepared by the Legislative Council. Copies of the bill and its explanation were placed on each legislator's desk. Shortly after its passage, No. 81–H–5692 became P.L. 1981, ch. 300. By its terms it was to become effective on December 31, 1981. After the General Assembly had adjourned in late spring of 1981, the 1981 reenactments of volumes 3 and 3A were placed in circulation. The volume 3 that is currently in use in the courthouse library has a stamp that indicates that it was received by our librarian on October 27, 1981.

As the distribution of the reenacted volumes was taking place, awareness was growing that § 14–1–6 no longer read as it formerly did. At year's end in 1981, the revised version of the "Retention of Jurisdiction" section read:

"14–1–6. * * * When jurisdiction shall have been attained by the court in the case of any child, such child shall, except as herein otherwise specifically provided, continue under the jurisdiction of the court until he becomes eighteen (18) years of age * * *."

Immediately with the advent of the new year 1982, the Public Defender's representatives sought the release of Richard and Frances from the training school by filing motions in the Family Court to review their current status. It was argued in their behalf that since each individual had attained his or her eighteenth birthday while at the school, the Family Court "lost jurisdiction of these youngsters" on December 31, 1981, and that they were entitled to their release. The trial justice who considered the motion

1. Journal of the House of Representatives, Volume 100, No. 29, p. 4.

2. Journal of the House of Representatives, Volume 100, No. 44, p. 9.

3. Marginal note, P.L.1981, ch. 300.

made in behalf of Frances ruled that the 1981 amendment was to be applied prospectively to delinquency adjudications made on and after December 31. The trial justice who presided at Richard's hearing simply declared that the General Assembly never intended to take away the court's jurisdiction.[4]

Before us, petitioners' counsel argue two points: (1) that the plain, simple language of the 1981 reenactment version of § 14–1–6 reduced from twenty-one to eighteen the age to which the Family Court retained jurisdiction over a child already subject to its authority and (2) that when the General Assembly at its January 1972 session reduced the age of majority from twenty-one to eighteen, the Legislature had impliedly reduced to eighteen the upper age limit of the Family Court's "retained jurisdiction." We disagree.

The argument that § 14–1–6 was amended by virtue of the reenactment process comes into proper focus once the process is understood. The 1981 reenactment of titles 11 through 14 represents a joint effort by the Secretary of State and the General Assembly to provide the legal community with an up-to-date compilation of the General Laws, as amended, for those four titles within a single volume. Each one of the four titles relates to a separate area of legislative concern, namely, (1) criminal offenses, (2) criminal procedures, (3) correctional institutions, and (4) children, such as the delinquent, wayward, dependent, or neglected. The periodic job of producing reenactment volumes for all of the General Laws encompasses rephrasing, rearranging, and consolidating of all the state's statutory laws, including all relevant new legislation, amendments, and repeals that have been effectuated since the last previous reenactment. Such a task might well be described as a "monumental undertaking" that, as a practical matter, cannot be assumed by the General Assembly directly but instead must be delegated to a group such as was done here. *See Viola v. Cahir,* 70 R.I. 394, 399, 40 A.2d 733, 736 (1944). When the revisionists have completed their task, they pass the fruits of their labor over to the General Assembly; then, as a formal step in the reenactment process, the General Assembly enacts the revised edition of the relevant titles and retires by revocation the older and now outmoded version.

When the General Assembly observed the formalities of enacting the revised legislation found in volume 3, it was acting upon approximately 600 pages of statutory law. As part and parcel of the 1981 reenactment process volume 3A, which embraces titles 15 through 18, was revised. It is composed of 730 pages and relates to such areas of concern as domestic relations, education, elections, and the regulation of trusts and trustees. So, with the passage of No. 81–H–5692, the General Assembly was being asked to give its approval in one fell swoop to well over 1,300 pages of legislation, some of which had been changed by the revisionists. It is totally unrealistic to think that in passing this hefty volume of legislation, the lawmakers accorded it the kind of attention conventionally devoted to proposed bills.

Recognizing that legislation promulgated during the reenactment process is passed only in the sense that legislative formalities are observed, this court has devised the rule that the meaning of a statute modified by a group such as the revision commission and subsequently reenacted is presumed to remain unchanged unless the specific proposed changes have been brought to the Legislature's attention. We have taken such an approach because a body such as a revision commission or a

---

4. The trial justice, in finding the legislative intent, relied on actions taken by the General Assembly when it returned to begin its January 1982 session. One of the first bills introduced when the House of Representatives convened on January 5, 1982, was a bill numbered 82–H–7016, which restored the twenty-one-year age limit to § 14–1–6. The bill became law seven days after its introduction and is now known as P.L. 1982, ch. 1. The act specifically states that it was to take effect upon its passage and to be retroactive to December 31, 1981. We would emphasize that the action taken by the General Assembly in 1982 has played no part in the manner in which we resolved the present controversy.

joint enterprise such as was undertaken here has no authority to change the meaning of the law or to alter its substance in any regard and the revisionists are assumed to have worked within the limits of their authority. *Briggs Drive, Inc. v. Moorehead,* 103 R.I. 555, 563, 239 A.2d 186, 190 (1968).

■ With respect to the controversy now before us, there is absolutely no evidence that the General Assembly was alerted to the downward revision of the age limit of the Family Court's retained jurisdiction. The only evidence of an informational undertaking is the explanation prepared by the Legislative Council. It reads: "This act reenacts Titles 11 through 18, both inclusive, of the General Laws of Rhode Island. The act will take effect December 31, 1981." This explanation is on a par with an explanation given by a legislator who, when moving passage of a bill, goes on to explain its contents by telling his or her colleagues that the title of the bill is "self-explanatory." An examination of the text of P.L. 1981, ch. 300, discloses that the act is replete with gobbledygook that would boggle the mind of even a Blackstone.[5]

The presumption of no change remains, and we read § 14–1–6 to mean precisely what it meant before the 1981 revisionists altered its wording. The Family Court's retained jurisdiction to the age of twenty-one was not modified by the enactment of P.L. 1981, ch. 300.

In urging that the 1972 reduction in the age of majority implicitly lowered the upper limit of the Family Court's retained jurisdiction to eighteen years, petitioners' counsel claim that once the court has made an appropriate adjudication such as, in this situation, delinquency, the court then assumes a custodial responsibility similar to that undertaken by a parent or legal guardian. According to petitioners' counsel, once the age of majority has been lowered, any teen-aged ward, upon reaching the magic age of eighteen, becomes emancipated from his or her guardian, and in petitioners' case, that emancipation meant that they were

entitled to be released from the training school.

■ In *Calcagno v. Calcagno,* 120 R.I. 723, 731, 391 A.2d 79, 84 (1978), we noted that minority is a status rather than a vested right. The same may be said about majority. We emphasized in *State v. Spivey,* 114 R.I. 43, 328 A.2d 414 (1974), that the state can properly prescribe a specific age qualification for potential jurors that results in a situation in which one can be old enough to vote but too young to sit on a jury. Even though the 1972 General Assembly classified eighteen-year-olds as persons "of full age," the 1980 General Assembly raised the so-called drinking age to nineteen as of July 1, 1980, and to twenty as of July 1, 1981. Public Laws 1980, ch. 142, § 2. This action clearly indicates that the Legislature, like many parents, recognizes that a legislative fiat classifying one as a person of full age does not *ipso facto* bestow on eighteen-year-olds the maturity of mind and soundness of judgment looked for in an adult. The statutory mandate calling for the retention of jurisdiction until a youth becomes twenty-one serves a legitimate purpose. A troubled youngster who enters into our juvenile justice system at an advanced age (let us say, a month before he or she turns eighteen) stands to benefit from the many shelter or rehabilitation services that are available under the aegis of the Family Court. Again, there are other young people within our community coming into the system at fifteen who are totally unresponsive to the system's rehabilitative processes and for whom confinement until age twenty-one may be necessary not only for society's protection but perhaps also for their own. We do not believe that the 1972 Legislature, when it extended to eighteen-year-olds the opportunity to enter into a binding contract or to purchase a six-pack, ever intended to terminate the rehabilitative and commitment functions of the Family Court once an individual categorized in § 14–1–5(A) reached age eighteen.

We think it noteworthy that in defining the outer limits of the Family Court's re-

5. *See* Appendix.

tained jurisdiction, the General Assembly referred specifically to age *twenty-one.* Earlier in the century, the District Courts were accorded "Juvenile Court" jurisdiction for the purpose of dealing with the delinquent and wayward youth, with jurisdiction over a child to be retained "during the minority of the child or until such time * * as the child may be discharged by the court * * *." Public Laws 1915, ch. 1185, sec. 10. This statute was codified in G.L. 1923, ch. 404, and recodified for publication in G.L. 1938, ch. 616. When the Juvenile Court was created in 1944, the upper limit of its retained jurisdiction was extended to age twenty-one, and any reference to the minority status was omitted. Public Laws 1944, ch. 1441, sec. 15.

We have always adhered to the rule that we look to express statutory law in defining the jurisdiction of the Family Court or any other statutory tribunal. In light of the explicit terms of G.L. 1956 (1969 Reenactment) § 14–1–6, there can be no question but that the power vested in the Family Court by the General Assembly allows it to retain jurisdiction over petitioners until they attain the age of twenty-one regardless of when they attained the age of majority.

The petitioners' guardianship contentions misconceive the power of the Family Court, which power is different from and supersedes that of a guardian. *See In re Joseph,* R.I., 420 A.2d 85, 88 (1980). The petitioners, in making their guardianship argument, refer us to cases in which their counterparts located elsewhere in the United States were, by virtue of their newly found majority, released from confinement that previously had been ordered by a Juvenile or Family Court. However, those successful petitioners were in jurisdictions where the court had not been granted by express legislative enactment the power to retain jurisdiction over juveniles until they reach the age of twenty-one, *Bartley v. Holden,* 338 A.2d 137, 141 (Del.Super.1975), *In re Carson,* 84 Wash.2d 969, 530 P.2d 331, 333 (1975), or in jurisdictions where the power to confine resulted from a ward-guardian relationship, *Flowers v. Haugh,* 207 N.W.2d 766 (Iowa 1973), *In re Carson, supra.*

The special treatment accorded youths who become subject to the Family Court's jurisdiction is possible because the General Assembly has seen fit to permit the court to assume the role of *parens patriae. See State v. Berard,* R.I., 401 A.2d 448, 450 (1979). "Parens patriae," which literally means "the father or parent of the country," is a concept that developed under the old English system whereby a court of equity, exercising the parental function of the Crown, could declare a child to be the ward of the Crown. Today, this concept signifies a philosphy whereby the state has a responsibility to act as a "superparent" to such persons under legal disabilities as troubled juveniles or the mentally ill. *See Matter of Female S.,* 111 Misc.2d 313, 444 N.Y.S.2d 829, 831 (1981).

In Rhode Island, the Family Court acts as a superparent that must not only provide for the needs of the youngsters subject to its jurisdiction but must also balance the needs of those youngsters with the needs and well being of the Rhode Island community at large.[6] Here, the General Assembly, in our opinion, in recognizing the crucial role of the Family Court, has made it amply clear that the statutory emancipation of an eighteen-year-old who, previous to emancipation day, had been subject to the Family Court's jurisdiction may be something less than total until the individual in question attains the age of twenty-one.

---

**6.** A reading of *State v. Berard,* R.I., 401 A.2d 448, 450 (1979), tells us that (1) at common law a person above the age of fourteen was considered to be fully responsible for "felonious conduct"; (2) the General Assembly, with its enactment of § 14–1–7, gave the justices of the Family Court the discretion to waive jurisdiction, after a full investigation, over any juvenile sixteen years or older when the juvenile misconduct would amount to an indictable offense if committed by an adult; and (3) § 14–1–7.1 excludes from the Family Court's jurisdiction a youngster over sixteen years of age who has, since becoming sixteen, committed what amounts to two indictable offenses. The waiver and exclusion provisos are demonstrative of the General Assembly's concern for the public safety of the community.

In short, Richard and Frances may have had reasons to celebrate their eighteenth birthdays, but deliverance from the Rhode Island Training School was not among them.

The petitions for habeas corpus are denied,[7] and the writs heretofore issued are quashed.

### APPENDIX

In cases in which any provisions of titles 22 through 28, both inclusive, and portions of Title 40.1, of the general laws of 1956 (re-enactments of 1968 and 1977)—re-enactment of 1979, are made to go into operation at any time after December 31, 1979, the corresponding provisions, if any, of the repealed statutes shall continue in force until such new provisions shall go into operation, except so far as is in the general laws otherwise expressly provided.

In cases in which any provisions of titles 43 through 47, both inclusive, of the general laws of 1956 (re-enactment of 1970)—re-enactment of 1980, are made to go into operation at any time after December 31, 1980, the corresponding provisions, if any, of the repealed statutes shall continue in force until such new provisions shall go into operation, except so far as is in the general laws otherwise expressly provided.

*In cases in which any provisions of titles 11 through 18, both inclusive, of the general laws of 1956—(re-enactment of 1969)—re-enactment of 1981, are made to go into operation at any time after December 31, 1981, the corresponding provisions, if any, of the repealed statutes shall continue in force until such new provisions shall go into operation, except so far as is in the general laws otherwise expressly provided.*

SECTION 7. Chapter 43–4 of the General Laws entitled "Effect of General Laws" is hereby amended by adding thereto the following sections:

*43–4–15.8. Repeal of General Laws by 1981 Re-Enactment.*—Titles 11 through 18, both inclusive, of the general laws of 1956 as enacted by chapter 34 of the public laws, 1957, and heretofore re-enacted, are hereby repealed, subject to the provisions contained in the preceding sections of this chapter.

*43–4–16.8. Repeal of Public Laws by 1981 Re-Enactment.*—All the statutes hereinafter mentioned, described and entitled, and passed since the publication of the general laws of 1956, are hereby repealed subject to the provisions contained in the preceding sections of this chapter, that is to say:

1969

Chapters 28, 36, 39, 49, 54, 55 (Sections 1, 3 only), 56, 65, 89, 99, 128, 129 (section 2 only), 138, 139, 140, 175, 190, 197 (Art. 7, section 2 only), 203, 206, 231, 239 (sections 13–19, 25, 27–29, 31, 32 only), 253.

1970

Chapters 3, 4, 6, 35, 70, 72, 87, 112 (Art. 1, sections 2, 3 only), 112 (Art. 2, sections 2, 3 only), 112 (Art. 4, sections 2, 3 only), 112 (Art. 8 only), 112 (Art. 9, section 2 only), 112 (Art. 10, section 2 only), 113 (section 2 only), 114 (section 3 only), 117, 120, 121, 130, 132, 145, 149, 161, 167, 186, 199, 203, 213 (section 1 only), 222, 225, 262, 264, 298, 315, 322.

1971

Chapters 13, 22, 23, 27, 30, 37, 43, 88, 89 (Art. 2 only), 115, 118, 136, 176, 184, 186, 193, 194, 207, 210, 211, 212, 215, 220, 221, 230, 253 (section 1 only), 270.

1972

Chapters 20, 23, 43, 50, 81, 92, 121, 134 (sections 1, 2 only), 139, 140, 152, 163 (sections 2, 8–11 only), 167, 168, 169 (sections 12, 13, 15, 16, 18, 19, 21, 23, 27 only), 169 (section 28 only), 193, 195, 197, 199, 208, 211, 214, 232, 252, 254, 257, 260, 265, 266, 267, 280, 282, 284, 292.

1973

Chapters 15 (section 2 only), 20, 27, 66, 78, 120, 145, 147, 148, 154, 170, 173, 208, 214, 219, 227, 246, 249, 266, 267, 273, 279, 280.

1974

---

**7.** At this point in time, both Richard and Frances have been released from the training school. Notwithstanding the question of mootness, we have considered the issues presented because of our belief regarding the significance of the issues and the likelihood of their recurring the next time a reenactment project is undertaken.

Chapters 23, 32, 36, 43 (section 6 only), 49, 51, 52, 58, 68, 82, 91, 105, 114, 115, 118 (sections 3–6, 8–15 only), 121, 123, 153 (section 2 only), 184, 187, 191, 204, 221 (sections 2, 4 only), 223, 224, 226, 232, 234, 236, 250, 252, 254, 284, 289, 290, 298.

1975

Chapters 18, 41, 88, 93, 94, 95 (section 2 only), 99, 106, 111, 112, 149, 173, 175, 176, 178, 190, 192, 199, 214, 231, 234, 242, 243, 246, 251, 252, 253, 258, 260 (Art. 4, sections 1–2 only), 274, 275 (section 2 only), 278, 282, 283, 285, 286, 287, 298.

1976

Chapters 18, 24, 27, 36, 52, 70, 71, 82, 83, 116, 130 (sections 1–3, 7–10 only), 150, 154, 170, 173, 187, 198 (Art. 1, section 13 only), 198 (Art. 6 only), 202, 204, 207, 212 (section 2 only), 216, 221, 223 (section 2 only), 229, 236 (section 2 only), 246, 250, 258, 287, 289 (section 4 only), 290 (sections 4–6, 8, 9 only), 292, 294, 301, 304, 306, 320, 323, 338.

This bill's other eight pages are equal in obtuseness to the two contained in this Appendix.